IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

ALLSTATE INSURANCE COMPANY,

        Plaintiff/Counter Defendant,

               v.

TANYA ROTE,

        Defendant/Counter Claimant.

No. 3:16-cv-01432-HZ

OPINION & ORDER

Brian C. Hickman
Gordon & Polscer, LLC
9755 SW Barnes Road, Suite 650
Portland, OR 97225

J. Scott Humphrey
Marcus L. Mintz
Seyfarth Shaw LLP
131 S. Dearborn Street, Suite 2400
Chicago, IL 60603

      Attorneys for Plaintiff/Counter Defendant

1 – OPINION & ORDER

Tanya Rote
24790 S.W. Big Fir Road
West Linn, OR 97225

       Pro Se Defendant/Counter Claimant

HERNÁNDEZ, District Judge:

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Plaintiff/Counter Defendant

Allstate Insurance Company ("Allstate") moves to dismiss seven counterclaims brought by pro

se Defendant/Counter Claimant Tanya Rote ("Rote"). The Court grants Allstate's motion to

dismiss.

## BACKGROUND

Allstate is a provider of insurance products and services. Compl. ¶ 15, ECF 1. Allstate

contracts with independent Exclusive Agents to sell its insurance policies to individuals and

businesses. Id. at ¶¶ 15, 16. Rote was an Exclusive Agent for Allstate from March 1, 2015

through February 29, 2016. Id. at ¶ 1.

In August 2014, Rote met with Doug Shell, Field Sales Leader for Allstate, who

explained to Rote how the Exclusive Agent program worked, including the compensation,

training, and support Rote would receive from Allstate. Shell Decl. ¶ 3, ECF 6; Def.'s Answer at

7, ECF 28. Rote entered into the Allstate program in December 2014. Def.'s Answer at 7. In

February 2015, Rote completed Allstate's new agent training. Id. In March 2015, Rote opened

her Allstate agency at 7427 S.W. Coho Court, Tualatin, OR 97068. Id. at 7, 8.

New Allstate Exclusive Agents purchase a group of policies, called a "book," from an

existing Allstate agent. Id. at 7. Allstate sets the premium value of each book; agents may only

sell their book of policies with Allstate's approval. See Rote Decl. Ex. F ("Asset Purchase

2 – OPINION & ORDER

Agreement"), ECF 29-8.  Allstate pays commissions on the value of the policies to Exclusive

Agents each month, along with other incentives for new agents who yield new policies.  Compl.

Ex. A ("Allstate Exclusive Agency Agreement") at 7, ECF 1-2.

Rote purchased a book of policies from Mark Hall (an Allstate Exclusive Agent), which

Allstate valued at $750,000, and began soliciting new business.  Def.'s Answer at 7, 8, 10.  In

Rote's first month as an Allstate Exclusive Agent, Rote was expecting a commission of $6,250,

based on financial projections made by Mark Hall.  Id. at 8, 9.  Instead, she received $848.  Id. at

9.  Rote states that Allstate acknowledged the error and promised to correct the payment.  Id.  In

May 2015, Rote received a commission of $8705.32, which allegedly was also erroneous.  Id.

Rote reported the commission payment errors to Allstate.  Id. at 10.  Rote alleges that Allstate

"refused to investigate and pay the balance owed."  Id.  Rote alleges that the commissions

remained underpaid throughout the first year.  Id.  Rote is still awaiting correct payment on

commissions.  Id.

Rote contends that her Allstate-approved marketing campaign was unsuccessful.  Id.

Rote began the marketing campaign by investing $5,000 to $7,000 per month in direct mail and

other marketing techniques.  Id.  Rote indicates that, of the number of people reached by the

marketing campaign, only "roughly 5%" of the prospective clients were eligible to be new

Allstate customers.  Id.  Rote argues this is because Allstate is only willing to insure a small

number of potential clients.  Id.  Rote complained to Allstate regarding the marketing

campaign.  Id. at 10, 11.  Allstate responded by informing Rote that "other agents were

successfully using the program."  Id. at 10.

Rote alleges that Allstate "intentionally misleads prospective agents to become agents

with false representations of financial success."  Id. at 13.  Rote further opines that Allstate

3 – OPINION & ORDER

denies Exclusive Agents the ability to sell independent insurance products, minimizing any

potential for additional income.  Id. at 11.  Rote argues that the Allstate-approved business model

was not profitable.  Id.  Rote felt "duped" into becoming an Allstate Exclusive Agent, and began

to consider leaving Allstate.  Id.

Rote sought options for selling her book of policies.  Id.  Under Rote's Agreement with

Allstate, Allstate must give approval for a transfer of ownership from one agent to another[1].  Id.

Rote contracted with Shannon Jennings of Cedar Hills Insurance to sell Rote's book of policies

to Jennings.  Id.

Rote alleges that Allstate undervalued her book at the time of the sale to Jennings.  Id.

The negotiated price for the sale of Rote's book was $815,000, based on Rote's approximation of

the value of the book.  Id. at 12.  Rote argues that, after Rote and Jennings negotiated a price,

Allstate changed its "gross premium report format."  Id. at 11, 12.  Based on the new reporting

model, Allstate valued Rote's book at $715,000.  Id. at 11, 12.  Rote and Jennings renegotiated

the purchase price and agreed to value the book at $756,000.  Id. at 12.  The change in formatting

reports resulted in a loss of "more than $65,000 of annual gross premium" to Rote's book.  Id. at

11.  Rote generated a report illustrating her loss of value and presented it to Allstate, but Allstate

refused to investigate any discrepancies.  Id. at 13.  The transfer of sale of the book became

effective March 1, 2016, ending Rote's Exclusive Agency Agreement with Allstate.  Rote Decl.

Ex. A at 1.

Although Rote was no longer an Allstate Exclusive Agent, Rote was still subject to

certain obligations not to compete, among other requirements.  Compl. ¶¶ 2-4.  For one year

following termination of the Exclusive Agency Agreement, Rote was forbidden from selling

---

[1] See Rote Decl. Ex. A at 3, ECF 29-1.  "Both parties acknowledge that this transfer of the Rote book must be disclosed and approved by Allstate, as outlined in Section XVI of Rote's agreement (Shell Decl. Ex. A at 8, ECF 6-1) with Allstate."

products in competition with Allstate within one mile of her former Allstate office.  Allstate

Exclusive Agency Agreement at 9.  Allstate alleged that Rote continued to operate an insurance

agency out of the same office location from which she operated her Allstate agency.  Compl. ¶ 5.

Allstate further alleged that Rote refused to return confidential information belonging to

Allstate.  Id. at ¶¶ 4, 6.

On March 20, 2016, Allstate sent Rote a letter reminding her, among other things, of her

agreement not to compete and her responsibility to return or dispose of all of Allstate's

confidential information.  Compl. Ex. B, ECF 1-3.  On May 26, 2016, Allstate sent Rote another

letter advising Rote that she was violating her post-termination requirements and demanding

Rote cease operations in violation of her agreement.  Compl. Ex. C, ECF 1-4.

On May 31, 2016, Rote responded to Allstate and asserted that Allstate had breached the

Agreement first.  Compl. Ex. D, ECF 1-5.  On June 8, 2016, Allstate wrote Rote a letter advising

her of possible litigation for failure to cease prohibited activities at her former Allstate office and

for failing to return Allstate's confidential information.  Compl. Ex. E, ECF 1-6.

On July 15, 2016, Allstate filed this suit against Rote alleging breach of contract and

misappropriation of trade secrets.  Compl. ¶¶ 54–94.  Allstate sought injunctive relief to enjoin

Rote from selling products in competition with Allstate at her former Allstate office, in violation

of her non-compete agreement, among other relief.  See Compl. at 17.  The Court granted a

partial injunction, requiring Rote to return, and cease from using, any Allstate confidential

information, and enforcing the non-compete agreement by removing "any visible signage and/or

advertising from the outside of Rote's office location[.]"  Allstate Ins. Co. v. Rote, No. 3:16-CV-

01432-HZ, 2016 WL 4191015, at *7 (D. Or. Aug. 7, 2016).

5 – OPINION & ORDER

On July 26, 2016, Rote filed an answer and counterclaims to Allstate's complaint.  See

Def.'s Answer.  Rote brings seven counterclaims: 1) request for declaratory judgment, 2) breach

of contract, 3) interference with contract, 4) defamation, 5) intentional infliction of emotional

distress, 6) interference with prospective economic advantage, and 7) legal fees and costs.  Id. at

18 – 22.

## STANDARDS

"Where a counterclaim fails to state a claim upon which relief can be granted, it must be

dismissed."  Silliman v. Hawes Fin. Grp., Inc., No. 6:15-CV-00285-AA, 2015 WL 5056353, at

*1 (D. Or. Aug. 26, 2015) (quotation omitted).  A motion to dismiss under Federal Rule of Civil

Procedure 12(b)(6) tests the sufficiency of the claims.  Navarro v. Block, 250 F.3d 729, 732 (9th

Cir. 2001).  "All allegations of material fact are taken as true and construed in the light most

favorable to the nonmoving party."  Am. Family Ass'n, Inc. v. City & Cnty. of S.F., 277 F.3d

1114, 1120 (9th Cir. 2002).  However, the court need not accept conclusory allegations as

truthful.  See Warren v. Fox Family Worldwide, Inc., 328 F.3d 1136, 1139 (9th Cir. 2003)

("[W]e are not required to accept as true conclusory allegations which are contradicted by

documents referred to in the complaint, and we do not necessarily assume the truth of legal

conclusions merely because they are cast in the form of factual allegations.") (internal quotation

marks, citation, and alterations omitted).  Rather, to state a plausible claim for relief, the

complaint "must contain sufficient allegations of underlying facts" to support its legal

conclusions.  Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

A motion to dismiss under Rule 12(b)(6) will be granted if a plaintiff alleges the

"grounds" of her "entitlement to relief" with nothing "more than labels and conclusions, and a

formulaic recitation of the elements of a cause of action[.]"  Bell Atl. Corp. v. Twombly, 550

6 – OPINION & ORDER

U.S. 544, 555 (2007).  "Factual allegations must be enough to raise a right to relief above the

speculative level on the assumption that all the allegations in the complaint are true (even if

doubtful in fact)[.]"  Id. (citations and footnote omitted).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face[,]" meaning "when the

plaintiff pleads factual content that allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(internal quotation marks omitted).  A complaint must contain "well-pleaded facts" which

"permit the court to infer more than the mere possibility of misconduct[.]"  Id. at 679.

"A document filed pro se is 'to be liberally construed,' and 'a pro se complaint, however

inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by

lawyers.'"  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (quoting Estelle v. Gamble, 429 U.S. 97,

106 (1976)) (citations omitted).

## DISCUSSION

The counterclaims at issue in this motion to dismiss are breach of contract, interference

with contract, defamation, and intentional infliction of emotional distress[2].  The Court grants the

motion to dismiss.

## I.    Breach of Contract – Counterclaim 2

Rote counterclaims breach of contract in her Answer as follows:

Rote is a secured lender to Tanya Rote Insurance Inc. (TRII), and its sole shareholder.
Allstate breached the contract and acted in bad faith with TRII almost immediately,
causing a great deal of financial harm to TRII and to Rote, who had to perform on a rent
guaranty and to make additional loans as a secured lender.  Said loans are not now

---

[2] Rote concedes that her first counterclaim seeking a declaratory judgement is moot.  Further, she
withdraws her sixth counterclaim of interference with prospective economic advantage.  Finally, her
seventh counterclaim for legal fees and costs is premature, given that the Court dismisses all of her other
counterclaims.

7 – OPINION & ORDER

recoverable.  [T]he actions of breach by Allstate have caused measurable damage to Rote in the amount of no less than $75,000.

Def.'s Answer at 19.

Under Oregon law, to state a claim for breach of contract, "[P]laintiff must allege the existence of a contract, its relevant terms, [P]laintiff's full performance and lack of breach and [D]efendant's breach resulting in damage to [P]laintiff." Ying Chang v. Citimortgage, Inc., No. 3:12-CV-01884-HU, 2013 WL 5939985, at *12 (D. Or. Nov. 2, 2013) (citing Slover v. Or. State Bd. of Clinical Soc. Workers, 144 Or. App. 565, 570-71, 927 P.2d 1098, 1101-02 (1996)).

In her counterclaim, Rote fails to identify the contract that Allstate allegedly breached.  In her response, she makes clear that she alleges that Allstate breached the Exclusive Agency Agreement.  Rote's counterclaim also fails to allege how Allstate breached the contract or how any alleged breach resulted in damage to Rote.  Again, Rote clarifies her allegations in her response, explaining that Allstate breached the contract by failing to pay the proper commissions to TRII and Rote.

However, these new allegations, which are nowhere to be found in Rote's counterclaim, are "irrelevant for Rule 12(b)(6) purposes." Schneider v. Cal. Dep't of Corr., 151 F.3d 1194, 1197 n.1 (9th Cir. 1990) ("In determining the propriety of a Rule 12(b)(6) dismissal, a court may not look beyond the complaint to a plaintiff's moving papers, such as a memorandum in opposition to a defendant's motion to dismiss.").  "In evaluating plaintiff['s] motion, the Court cannot consider materials beyond the pleadings and therefore disregards the new factual allegations first articulated in defendant['s] response brief." See Silliman, 2015 WL 5056353, at *2.

Allstate argues that, even if Rote were to amend her counterclaim to include the allegations discussed above, such an amendment would be futile.  Allstate argues that Rote has

8 – OPINION & ORDER

not identified any specific provision of the Exclusive Agency Agreement that Allstate allegedly

breached.  Furthermore, according to Allstate, Rote cannot allege full performance of the

Exclusive Agency Agreement because of this Court's prior ruling that Rote breached her post-

termination obligations to return Allstate confidential information and to not solicit competing

insurance products from within one mile of her former Allstate agency location.

Although Allstate is correct that Rote failed to properly allege which provision of the

Agreement Allstate allegedly breached, the Court disagrees with Allstate's argument that it

would be futile to allow Rote leave to amend her claim with more specificity.  As to Allstate's

second argument, Allstate cites no authority for the proposition that Rote's failure to comply

with post-termination contractual obligations bars her from asserting that Allstate breached the

Exclusive Agency Agreement many months earlier.  However, Allstate is correct that Rote must

plead her own full performance and lack of breach, which she fails to do.  In sum, Rote fails to

state a claim for breach of contract and, thus, her claim is dismissed.

## II.       Interference with Contract – Counterclaim 3

In Rote's third counterclaim for Interference with Contract, Rote alleges:

Rote is a secured lender to Tanya Rote Insurance Inc. (TRII), and its sole shareholder.
Allstate interfered with TRII's contracts, with the acquisition of the Mark Hall (and his
corporation) book of policies and the sale of the TRII book of policies to Shannon
Jennings (and her corporation), causing a great deal of financial harm to TRII and to
Rote, who had to perform on a rent guaranty and to make additional loans as a secured
lender.  Said loans are not now recoverable.  The action of interference by Allstate as to
Hall arises because Allstate conspired with Hall to misrepresent the gross premium value
of policies sold to Rote & confirmed by Allstate.  Then Allstate refused to pay
commissions on policies owned by TRII, policies still active and otherwise refused to
provide documentation as to why the premiums were not paid.  Allstate interfered with
the Jennings contract by suddenly reducing the gross premiums of policies in Rote's
book, without explanation, causing a reduction to the sales price of Rote's book of
policies.  Allstate has caused measurable damage to Rote in the amount of no less than
$50,000.

Def.'s Answer at 19.

9 – OPINION & ORDER

To state a claim for tortious interference with contract the proponent must prove:

(1) [T]he existence of a professional or business relationship (which could include, e.g., a contract or a prospective economic advantage), (2) intentional interference with that relationship, (3) by a third party, (4) accomplished through improper means or for an improper purpose, (5) a causal effect between the interference and damage to the economic relationship, and (6) damages.

Farmers Ins. Exch. v. First Choice Chiropractic & Rehab., No. 3:13–CV–01883–PK, 2015 WL 4506401, at *9 (D. Or. July 22, 2015) (quoting Straube v. Larson, 287 Or. 357, 360-61, 600 P.2d 371, 374 (1979)).  To maintain a claim for intentional interference, an injury must be established by showing that "defendant's wrongful actions have rendered plaintiff's obligations more onerous or prevented plaintiff from realizing the full benefit of his contract with a third party."  Banaitis v. Mitsubishi Bank, Ltd., 129 Or. App. 371, 381, 879 P.2d 1288, 1296 (1994) (citations omitted).  Causation can be established if the defendant's conduct causes a third party to terminate a contract with the plaintiff, or induces a third party from entering into a business relationship with the plaintiff.  Thompson v Tel. & Data Sys., Inc., 130 Or. App. 302, 313, 881 P.2d 819, 826 n.1 (1994).

In her counterclaim, Rote identifies the existence of two contracts: 1) Rote and Mark Hall; and 2) Rote and Shannon Jennings.  As to the first contract, Rote properly alleges the existence of a business relationship between Rote and Mark Hall and resulting damage to Rote. Rote states that she purchased Hall's book of policies, thus creating the existence of a business relationship.  Rote argues that the damages she suffered resulted from the misrepresented value of the book.  Rote alleges that Allstate's interference was the cause of her injury.

However, Rote's claim regarding the Hall contract fails because she does not allege that Allstate's interference was accomplished through improper means or for an improper purpose. An interference is "wrongful" if it is carried out in pursuit of an improper motive or by improper

10 – OPINION & ORDER

means.  Empire Fire & Marine Ins. Co. v. Fremont Indem. Co, 90 Or. App. 56, 62, 750 P.2d

1178, 1181 (1988).  "Improper means" must be independently wrongful by reason of statutory or

common law, beyond the mere fact of the injury complained of.  Conklin v. Karban Rock, Inc.,

90 Or. App. 593, 601, 767 P.2d 444, 448 (1989).  Even assuming Allstate conspired with Mark

Hall to misrepresent the value of the book, Rote fails to allege that Allstate's purpose was "to

inflict injury on the plaintiff 'as such.'"  Nw. Natural Gas Co. v. Chase Gardens, Inc., 328 Or.

487, 498, 982 P.2d 1117, 1124 (1999) (quoting Top Serv. Body Shop, Inc. v. Allstate Ins. Co.,

283 Or. 201, 211, 582 P.2d 1365, 1371-72 (1978)).  Improperly valuing a book is not, by itself,

wrongful interference.  For this reason, Rote's claim fails as to the Hall contract.

As to the second contract, Rote properly alleges the existence of a business relationship

between Rote and Shannon Jennings and resulting damage to Rote.  Rote alleges that Allstate

changed its reporting format, causing a sudden reduction in the value of Rote's book as it was

being sold to Jennings.  Rote further alleges that Allstate provided no explanation for the

reduction in value.

However, Rote's claim as to the Jennings contract fails because she does not allege that

Allstate interfered through an improper means or for an improper purpose.  Nor does Rote allege

a causal effect between any alleged interference and damage to the economic relationship

between Rote and Jennings.  Thus, her claim is dismissed in regards to both the Hall and

Jennings contracts.

The Court additionally notes that, while Allstate did not challenge the "third party"

element of Rote's claim, the Court has doubts as to whether Allstate can be considered a third

party in the context of a claim of interference with contract.  An Oregon Court of Appeals case

offers guidance on this issue.  See Wieber v. FedEx Ground Package Sys., Inc., 231 Or. App.

11 – OPINION & ORDER

469, 220 P.3d 68 (2009).  In <u>Wieber</u>, the plaintiff contracted with FedEx as an independent

contractor.  <u>Id.</u> at 74.  Wieber picked up and delivered packages for FedEx to customers within a

designated service area.  <u>Id.</u> at 74.  The agreement between FedEx and Wieber granted Wieber

"proprietary interests" in the customer accounts within his designated service area, so long as he

remained in "good standing[.]"  <u>Id.</u> at 73.  After FedEx terminated him, Wieber sued, alleging

that FedEx intentionally interfered with Wieber's contracts with his customers.  <u>Id.</u> at 74, 75.

The Oregon Court of Appeals held that FedEx was not a "third party" because the relationship

Wieber had with his customers was inextricably linked to his relationship with FedEx.  <u>Id.</u> at 77.

In other words, Wieber did not have any economic relationship with his customers outside of his

contractual relationship with FedEx.

Here, the Court questions whether Rote can establish that Allstate was a "third party."  It

appears that Rote's relationship with Hall and Jennings was "inextricably linked" to Rote's

relationship with Allstate, because her economic relationship to Hall and Jennings only existed

due to her contractual relationship with Allstate.  However, Rote is granted leave to amend.  If

she can show her relationship with Hall and Jennings existed outside of her relationship with

Allstate, then she may be able to meet the third party element.  <u>See, e.g.</u>, <u>Kramer v. S. Or. Univ.</u>,

No. 1:13–CV–00340–CL, 2013 WL 4782154, at *5, *6 (D. Or. Sept. 5, 2013) (finding that

Plaintiff had a distinct relationship with the third party, outside of his relationship with

Defendant).

## III.    Defamation – Counterclaim 4

Rote's fourth counterclaim alleges defamation as follows:

Prior to the litigation filed by Allstate, Doug Shell, Brent Wise and Others [sic] working
for Allstate attacked Rote's business reputation by alleging that Rote was soliciting
customers on policies she purchased from Hall, produced in the one year she was an
Allstate agent, or sold to Jennings.  As part of the sale to Jennings, Rote and TRII

12 – OPINION & ORDER

identified family policies that would not be sold to Jennings, policies that would be canceled.  Allstate approved that contract.  Nonetheless Allstate continued to assert falsely, as they have in the complaint, that Rote is soliciting customers identified in non-solicitation agreement with Allstate, assertions they knew were false and with the intention of hurting Rote's professional reputation.  This action has resulted in damages to Rote in the amount of no less than $1,000,000 against Allstate, Shell, Wise and others to be identified through discovery.

Def.'s Answer at 20.

To state a claim for defamation, a claimant must show: (1) the making of a defamatory statement; (2) publication of the defamatory material; and (3) a resulting special harm, unless the statement is defamatory per se and therefore gives rise to presumptive special harm.  Hoy v. Yamhill Cnty., 107 F. Supp. 3d 1078, 1095-96 (D. Or. 2015) (citing Nat'l Union Fire Ins. Co. of Pittsburgh Pa. v. Starplex Corp., 220 Or. App. 560, 584, 188 P.3d 332, 347 (2008) (internal citation omitted)).  "A defamatory statement is a false statement that would subject the plaintiff 'to hatred, contempt or ridicule . . . [or] tend to diminish the esteem, respect, goodwill or confidence in which [the plaintiff] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the plaintiff].'" Tubra v. Cooke, 233 Or. App. 339, 347–48, 225 P.3d 862, 867 (2010) (citations omitted).

Rote contends that Doug Shell, Brent Wise, and other Allstate employees alleged that Rote was soliciting business from existing Allstate customers after leaving Allstate.  Further, Rote alleges Allstate did so with the intent to harm her professional reputation.

> In the professional context, a statement is defamatory if it is false and "'ascribes to another conduct, characteristics or a condition incompatible with the proper conduct of his lawful business, trade, [or] profession.'" Fowler v. Stradley, 238 Or. 606, 611, 395 P.2d 867, 869 (1964) (quoting Restatement (First) of Torts § 573 [(1938)]).  Indeed, if a defendant has defamed a plaintiff by falsely "accus[ing] him of misconduct or dishonesty in the performance of his profession or employment," then the matter "is actionable without proof of specific harm." Wheeler v. Green, 286 Or. 99, 124, 593 P.2d 777, 791 (1979).

13 – OPINION & ORDER

Brown v. Gatti, 341 Or. 452, 458, 145 P.3d 130, 133 (2006).  Rote adequately alleges that the statements made by Allstate employees were false and accused Rote of dishonesty in the performance of her employment.

However, Rote's claim fails because, even assuming that Rote can demonstrate that the statements made were defamatory *per se*, thus negating the need to show special damages, Rote fails to allege that any of Allstate's employees' statements were published.  In general, a statement is published when it is communicated to a third party.  Haliburton v. Cnty of Linn, No. 07-6026-PK, 2007 WL 4565238, at *7 (D. Or. Dec. 21, 2007) (citing Wallulis v. Dymowski, 323 Or. 337, 342-343, 918 P.2d 755, 758 (1996)).  In other words, if a person makes a defamatory statement about another person, but that statement is not conveyed to a third party, no publication has occurred.  Id.  The publication of a defamatory statement is essential to a plausible claim.  Id.

Here, Rote states that Allstate's employees attacked her business reputation by making allegations.  But, Rote does not make any allegation that such statements were communicated to a third party.  Rote submits a declaration from Shannon Jennings, who states that employees of Allstate had asked Jennings if Rote had solicited Allstate customers after Rote had left Allstate. Jennings Decl. Ex. 1 ¶5, ECF 31-1.  However, as noted above, the Court will only look at what has been pleaded in Plaintiff's counterclaim to determine if she states a claim.  Rote fails to properly allege the publication of any defamatory statements.

The Court also notes Rote's argument that Allstate continues to defame her while in litigation.  To the extent that any of Rote's counterclaims are based on the filing of this case against her, they must be dismissed.  See Wallulis, 918 P.2d at 761.  (statements made in judicial

proceedings are absolutely privileged).  Rote cannot base her claim for defamation on the filing

of this suit.  Thus her claim is dismissed.

**IV. Intentional Infliction of Emotional Distress (IIED)—Counterclaim 5**

Rote's fifth counterclaim alleges that Allstate has intentionally inflicted emotional

distress on her through "aggressive behavior" in litigation.  Rote alleges that the present action

by Allstate was brought against Rote in retaliation for Rote being "outspoken about the

unlikelihood of success by new agents given the underwriting policies of Allstate."  Def.'s

Answer at 20.

To state an IIED claim, Rote must show that Allstate intended to inflict severe emotional

distress, that Allstate's acts were the cause of Rote's severe emotional distress, and Allstate's

acts constituted an extraordinary transgression of the bounds of socially tolerable

conduct.  McGanty v. Staudenraus, 321 Or. 532, 563, 901 P.2d 841, 849 (1995).  Whether the

alleged conduct constitutes an extraordinary transgression of the bounds of socially tolerable

conduct is a question of law for the court.  Harris v. Pameco Corp., 170 Or. App. 164, 171, 12

P.3d 524, 529 (2000).  In a 2008 case, the Oregon Court of Appeals explained the following

parameters of the tort:

> A trial court plays a gatekeeper role in evaluating the viability of an IIED claim by
> assessing the allegedly tortious conduct to determine whether it goes beyond the farthest
> reaches of socially tolerable behavior and creates a jury question on liability.
>
> &ast; &ast; &ast;
>
> As explained in the Restatement [(Second) of Torts] at § 46 comment d [1965]:
> "Liability has been found only where the conduct has been so outrageous in character,
> and so extreme in degree, as to go beyond all possible bounds of decency, and to be
> regarded as atrocious, and utterly intolerable in a civilized community."

House v. Hicks, 218 Or. App. 348, 358, 179 P.3d 730, 736 (2008) (internal quotation marks and

citations omitted).

15 – OPINION & ORDER

Even if Rote could establish the first two elements of her IIED claim, Rote's claim fails because she does not allege any acts by Allstate that "meet the very high standard" of "an extraordinary transgression of the bounds of socially tolerable conduct." Amadi v. ConAgra Foods, Inc., 881 F. Supp. 2d 1227, 1243 (D. Or. 2012) (citation omitted).  At most, Rote alleges that Allstate has been aggressive in pursuing litigation against Rote.  However, Oregon case law supports the conclusion that filing a lawsuit will rarely fit the definition of outrageous conduct.  Christofferson v. Church of Scientology of Portland, 57 Or. App. 203, 225, 644 P.2d 577, 591-92 (1982) (finding that defendants' filing of a libel case against the plaintiff did not constitute the kind of "rare case" where filing a suit would constitute outrageous conduct); Erlandson v. Pullen, 45 Or. App. 467, 473, 608 P.2d 1169, 1172 (1980) (finding that an IIED claim could not be sustained based on the initiation of a lawsuit for fraud); see also Jefcoat v. Foreman, No. 1:15-CV-00456-CL, 2016 WL 3468964, at *4 (D. Or. Apr. 29, 2016), report and recommendation adopted, No. 1:15-CV-00456-CL, 2016 WL 3457164 (D. Or. June 23, 2016) (analogizing the issuance of a demand letter with initiating a civil suit and finding that neither forms the basis for an IIED claim).

Rote fails to allege any facts that persuade the Court to depart from the general rule that initiating a lawsuit is not "flagrantly unacceptable" behavior.  See Holloway v. Clackamas River Water, No. 3:13-CV-01787-AC, 2014 WL 6998069, at *7 (D. Or. Sept. 9, 2014), report and recommendation adopted, No. 3:13-CV-01787-AC, 2014 WL 6998084 (D. Or. Dec. 9, 2014). Accordingly, the fact that Allstate has pursued litigation, even if aggressively, cannot form the basis for an IIED claim.  The Court thus dismisses Rote's claim.

/ / /

/ / /

## CONCLUSION

The Court grants Plaintiff's Motion to Dismiss Defendant's Counterclaims [40].

However, the Court grants Defendant leave to amend.  If Defendant wishes to amend her

counterclaims, she must do so within 14 days of the date below.

IT IS SO ORDERED.

Dated this _____14_____ day of _____Nov_____, 2016.


_____

MARCO A. HERNÁNDEZ
United States District Judge